**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

_____
                                           :
CVS PHARMACY, INC.                         :
                                           :         C.A. NO. 1:21-cv-00070
        Plaintiff,                         :
                                           :
    v.                                     :
                                           :
TIMOTHY M. BROWN                           :         FEBRUARY 23, 2021
                                           :
        Defendant.                         :
_____:

**PLAINTIFF'S REPLY TO DEFENDANT'S OPPOSITION TO EMERGENCY MOTION**
**FOR TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

CVS Pharmacy, Inc. ("CVS/Aetna") requests that this Court issue a Temporary

Restraining Order ("TRO") that:

- Allows Brown to begin employment with Cigna immediately;

- Permits Brown to work on developing the national provider network strategy for

  Cigna's Medicare Advantage ("MA") business and other business units;

- Permits Brown to work for Cigna in any role outside of MA;

- Prohibits Brown from using or disclosing any trade secret or confidential information;

  and

- Specifically prohibits Brown from working in a role involving:

  - Growth or expansion of Cigna's MA program nationally;

  - Duals plans at Cigna; or

    o   Managing Cigna's MA program in Washington, Oregon, Idaho, Utah, Nevada, Wyoming, Montana, or Alaska.

The TRO should remain effective until a hearing on a preliminary injunction so that Brown cannot use or disclose Aetna's confidential information on behalf of Cigna. CVS/Aetna has proposed such a stipulated order to Cigna's counsel, but neither Cigna nor Brown has accepted the offer.

A TRO must issue because of the continued likelihood that Brown's new national position at Cigna will cause irreparable harm to CVS/Aetna because of a breach of his Restrictive Covenant Agreement ("Agreement") and his inevitable use of Aetna's trade secrets. Nothing advanced by Brown sufficiently challenges the strong arguments originally advanced by Aetna. In its Reply today, CVS/Aetna presents additional information which refutes Brown's claims and demonstrates the severity of the situation. A TRO is particularly appropriate here, where CVS/Aetna has agreed that Brown may begin working for Cigna in a limited role while the parties proceed to a full preliminary injunction hearing.

Brown argues that he was a mere "regional" manager who knew nothing and saw nothing related to CVS/Aetna's Medicare Advantage ("MA") business outside of his region. But his sworn statements about his limited role and knowledge are demonstrably false. The Verified Complaint and attached declaration show that:

- CVS/Aetna provided him with valuable confidential information about its **MA business <u>outside</u> the Northwest and Mountain territory** that he needed to do his job;

- CVS/Aetna sent Brown its national MA strategies for growth and expansion, Duals/DSNP contracts, improvement of Medicare STARS ratings across key markets nationwide, product development, and marketing for the 2021 bid cycle; and

- Brown could use this information to the benefit of Cigna's national MA business and to Aetna's detriment.

The legal roadblocks advanced by Brown are without merit. This Court has personal jurisdiction in this matter because Brown admits (1) he voluntarily attended a multi-day leadership training in Rhode Island last year, (2) he received and profited from a substantial equity grant from a Rhode Island company, which served as the consideration for the restrictive covenant at issue in this case; (3) the Agreement included a Rhode Island choice of law provision; and (4) he was employed by, and knew that he was employed by, a company that was a wholly owned subsidiary of a Rhode Island company.[1]

Under these circumstances, CVS/Aetna has a strong likelihood of prevailing on the merits and will suffer irreparable harm if Brown is allowed to lead Cigna's national Medicare Advantage business in 2021.  *See Aetna Ret. Servs., Inc. v. Hug,* No. CV970479974S, 1997 WL 396212, at *11 (Conn. Super. Ct. June 18, 1997) ("It is unquestionable that Hug is a person of unimpeachable integrity whose honesty is widely respected and admired. Nevertheless, Hug's decisions, contributions and strategic insights cannot help but be informed

---

[1] Brown notified CVS/Aetna in late January 2021 that his final paycheck should be sent to an address in Scottsdale, Arizona.  In addition, real estate listings indicate that Brown is in the process of selling his residence in Seattle.  Brown seeks the protection of Washington state law. However, putting aside the strong arguments that Rhode Island law applies as discussed herein, there is now a substantial question as to whether Brown remains a resident of Washington and can seek that state's legal protections.  Notably, Brown's Declaration does not affirm that he is a <u>current</u> resident of Washington state. (*See* Brown Decl., ¶ 3, ECF 11-1.)

by the framework and knowledge he gained in his employment at Aetna in making and participating in strategic business, sales, product and marketing plans.").  This Court should therefore grant CVS/Aetna's proposed Temporary Restraining Order to preserve the status quo until a hearing on the preliminary injunction is held.

### I.      Brown's Declaration Underscores the Need for a TRO

Brown's declaration in opposition to the TRO paints a misleading picture of his role at CVS/Aetna and knowledge of its Confidential Information.  While Brown argues that he was not "responsible" for other regions or Aetna's national strategy, he fails to mention the volumes of confidential information he received, the numerous meetings he attended, and the frequent communications he had with Aetna's other regional leaders and national segment leaders.

CVS/Aetna submits the Declaration of Michael Kavouras and accompanying exhibits under seal in support of its Motion for TRO.  The Kavouras Declaration shows that Brown:

- Received non-public STARS ratings forecasts for the 2022 plan year;

- Was provided with information about Aetna's national Duals/DSNP strategy and performance;

- Shared MA contracts with other Aetna regions;

- Interacted with and shared competitive intelligence with his peer CMOs from other regions; and

- Received information about Aetna's bid planning, including product development and marketing, for the 2022 plan year.

Brown suggests he disregarded all of this information.  But the evidence tells a different story.  Brown's role <u>required</u> a high degree of integration into all of Aetna's Medicare segments.  He could not have been a successful CMO by walling himself off from other regions -- with which he shared major MA contracts -- or from the national business leaders. (Kavouras Decl., ¶¶ 17-18).  To the contrary, CVS/Aetna identified Brown as an emerging leader in the company, and trusted Brown with its most confidential forecasts, financial performance data, growth and expansion plans, and marketing strategies. (Kavouras Decl., ¶ 20).  The Kavouras Declaration and supporting exhibits prove that Brown's characterization of his role at CVS/Aetna and knowledge of Confidential Information is inaccurate, and further demonstrates CVS/Aetna's likelihood of success on the merits.

      a.   <u>Brown knows CVS/Aetna's National STARS Strategy and will use it in his National Role at Cigna.</u>

Brown states that he "did not have access to information about CVS/Aetna's STARS ratings and Duals strategy."  (Brown Decl., ¶ 27, ECF 12-1.)  This is simply not true.  Brown received Confidential Information in the form of non-public STARS ratings forecasts for CVS/Aetna's MA plans nationwide on a regular basis.  In the last few months prior to his resignation -- from October to December of 2020 -- he received monthly Stars Excellence Committee Meeting slide decks and Monthly DSNP Stars Updates.  (Kavouras Decl., ¶ 25). The October 20, 2020 report includes a chart showing the forecasted 2022 Stars rating for <u>all of the DSNP markets nationwide</u>, and the corresponding rating for the overall performance for each market.  Underperforming markets are shown in red.  A copy of that chart is included in the Kavouras Declaration.  (Kavouras Decl., ¶ 23).

The exhibits cited in the Kavouras Declaration, which Brown received from October to December of 2020, identify markets where CVS/Aetna is projecting a drop in STARS ratings to below 3.5. This type of Confidential Information would be invaluable to Cigna.  Armed with this business intelligence, Cigna can concentrate its product offerings, marketing and advertising spends, and distribution strategies to capitalize on Aetna's forecasted STARS declines.

Brown admits that if permitted to begin working for Cigna, he will be responsible for "oversight of a team that will oversee functions necessary for the operations and growth of the Medicare Advantage program within Cigna." (Brown Decl., ¶ 35, ECF 12-1.) Brown "... will be responsible for the national Medicare Advantage program, excluding the region in which [he] worked while at CVS/Aetna."[2] (Brown Decl., ¶ 36, ECF 12-1.) STARS ratings are a critical component to growth and expansion of any MA business, which Brown all but admits. (Brown Decl., ¶ 11, ECF 12-1.) Brown argues that he should be permitted to compete nationally against CVS/Aetna and that he will not "use any confidential information from CVS/Aetna in [his] duties at Cigna" because "there are substantial business model differences between the two companies that would render such information useless." (Brown Decl., ¶ 37, ECF 12-1.) Brown fails to acknowledge that, regardless of the business model utilized, Aetna and Cigna are competing, head-to-head, for enrollment of the same members into their respective MA programs across the same markets.

---

[2] Brown does not explain how he could be responsible for advancing Cigna's national MA strategies while not having an impact on his former territory.  Brown suggests that Cigna is organized differently from Aetna, but leaves the Court – and CVS/Aetna – guessing how the management of his former territory could be separated from his national duties.

Brown knows how Aetna operates in the MA business, he knows Aetna's weaknesses, and he is poised to exploit those weaknesses if permitted to oversee Cigna's growth and expansion of MA plans nationwide.  CVS/Aetna has justifiable concerns that Brown will work to take market share away from Aetna through the use of this Confidential Information.[3] CVS/Aetna has alleged that Brown "regularly participated in Aetna's Medicare Advantage leadership meetings concerning Medicare business performance and strategy for 2022." (Verified Compl., ¶ 99.) Brown had access to and received Confidential Information regarding Aetna's MA business not just at the regional level, but also on a national level. (Verified Compl., ¶ 117).  *See CVS Pharmacy, Inc. v. Lavin*, 951 F.3d 50, 59 (1st Cir. 2020) ("Under Rhode Island law, "a business's confidential information … may qualify as a legitimate interest" that a noncompetition agreement can protect.").  Brown's understanding of Aetna's national market strengths and weaknesses will be of incalculable value to Brown and will inevitably be used by him as he attempts to grow Cigna's MA market share - regardless of the "business model" utilized by Cigna.  *See Astro-Med, Inc. v. Nihon Kohden Am., Inc.*, 591 F.3d 1, 17 (1st Cir. 2009) (affirming this Court's finding of legitimate business interest in an employer's proprietary information, "including strengths and weaknesses of its products, its pricing strategies, the new products under development, and its customers.").

    b.  <u>Brown Received Confidential Information on Aetna's Duals Performance and Strategy</u>

In his Declaration, Brown disclaims virtually all knowledge of Aetna's Duals or DSNP programs, including those in his own region.  (Brown Decl., ¶¶ 24, 27, 30, ECF 12-1.) His assertions are not credible, particularly because he helped develop and implemented a new

---

[3] CVS/Aetna has previously defined "Confidential Information" in its original brief.

Duals program in Nevada.  (Verified Compl., ¶ 73.)  Moreover, Brown attended monthly

DSNP Steering Committee Meetings from October 2020 to December 2020, a DSNP

Leadership Forum on December 16, 2020, and received monthly DSNP Stars Updates.  (*See*

Kavouras Decl., ¶¶ 22, 23.)

In inviting Brown to participate in the DSNP Leadership Forum in December,

CVS/Aetna informed Brown that: "These meetings are applicable for all of those in the 23

states that offer a DSNP plan for 2021." (Kavouras Decl., ¶ 23 & Exhibit 13).  The meeting

contained information on product goals, strategies for retention and acquisition, and state-

specific considerations for various states, including those outside of Brown's region for the

upcoming year.  In addition, as discussed above, the Monthly DSNP Stars Updates contained

non-public Stars forecasts for DSNP contracts across the country. In short, Brown has valuable

information regarding the Duals program for 2021 and he will be in a position to use it while

at Cigna.

### c. Brown Shared Contracts with Other Regions and Regularly Interacted with Aetna's National and Regional Business Leaders.

Brown portrays Aetna's MA organization as fragmented, siloed, and disconnected.

This is not accurate. It does not reflect the reality of Aetna's national MA business

organization. Aetna operates its MA business as a national unit.  Brown was a key part of that

unit.  With total Profit & Loss ("P&L") responsibility for his region, he was expected and

incentivized to work with CMOs in other regions as well as Aetna's national business leaders.

Brown's own Outlook calendars present strong, evidence on this issue.  (*See* Kavouras Decl.,

Exhibit 2.)  Brown's calendar entries from October 2020 to December 2020 reflect no fewer

than 15 meetings with CMOs outside of his region. (Kavouras Decl., Exhibit 2.) For example,

8

he attended West/South Central Territory Monthly Leadership Meetings in October, November, and December of 2020, which included discussions regarding the California, Texas, Oklahoma, and New Mexico markets.  (Kavouras Decl., ¶ 18)  Brown received slide decks containing Confidential Information on market performance and strategy for expansion and growth in advance of each of these meetings.  During these meetings, each Market President and CFO gave a brief "walk-through of their 2021 membership and finance plan." *Id*.  In the December meeting, presenters disclosed the specific counties in California in which Aetna intended to expand in 2022. Brown can use this information in order to expand Cigna's national MA program which would cause substantial competitive harm to CVS/Aetna by undermining its expansion plans with targeted product development or marketing.  (*See* Kavouras Decl., ¶ 29.)

   In addition, Brown's region shared key MA contracts with other regions. As a consequence, the sharing of Confidential Information, such as STARS forecasts, was not only encouraged but necessary to maintain the profitability of those contracts.  Fourteen out of Aetna's fifteen geographic regions, including Brown's region, share a nation-wide PPO contract. (Kavouras Decl., ¶ 17.) Brown and the other CMOs who use the national PPO, are invested in maintaining a high STARS Rating to keep this contract successful.  (Kavouras Decl., ¶ 17.) In addition, Brown had four MA contracts that were shared with states outside of his region.  These contracts comprised nearly half of the total Medicare Advantage membership in his region.  Brown was necessarily invested in the success of these shared contracts. (Kavouras Decl., ¶ 17.) Brown would not need to remember which states outside of his region share particular contracts.  All he has to remember is the projected STARS Ratings

for the shared contracts that touch his region -- which he admits he would know (Brown Decl., ¶ 27, ECF 12-1) -- and he can affect Aetna's business in other regions that shared these contracts.  Once again, Brown's overwhelming amount of knowledge of Confidential Information related to STARS (his denials notwithstanding) demonstrates the need for a TRO.

> d. <u>Brown's Description of his Role at Aetna is Inaccurate and Overly Narrow</u>

Brown alleges that he did not have "operational knowledge of other Aetna regions." (Brown Decl., ¶ 5, ECF 12-1.)  He also attempts to portray his role as a CMO as exclusively a sales role.  (*See* Brown Decl., ¶ 20, ECF 12-1.) However, such statements are at odds with his own admissions.  As an Aetna CMO, Brown proudly boasted that he had full "P&L" (profit and loss) responsibility for his eight state region. (Verified Compl., Exhibit B.)  As such, Brown was not just responsible for sales; he had responsibility for implementing Aetna's plans regarding product configuration (including Duals), compliance, STARS strategies, member experience, marketing, advertising, distribution, and over-all financial performance of the region.  (Kavouras Decl., ¶ 21.)  Given his broad role, his interactions with other CMOs, his interactions with Aetna's national teams, and his receipt of a wealth of Aetna' Confidential Information, Brown has a "working knowledge" of Aetna's <u>national</u> MA business.

Brown has repeatedly misstated and misrepresented his role at CVS/Aetna and his knowledge of Aetna's MA business.

- "I had no involvement or role in connection to other regions or in national market strategy." (Brown Decl., ¶ 5, ECF 12-1.)
  - *Compare with* Kavouras Decl., ¶¶16, 17 (providing evidence that Brown attended meetings and received documents detailing Aetna's national

strategies for Medicare and national Medicare contracts); ¶18 (providing evidence that he attended leadership calls in which the stated objective was "to talk through cross cutting issues spanning multiple markets"); ¶19 (providing evidence of Brown's meeting with Director for Medicare Sales regarding Aetna's <u>national</u> agency fee contract guidelines).

- "I was responsible for individual membership sales within my review, including revenue growth and generating profit." (Brown Decl., ¶ 20, ECF 12-1.)

  o *Compare with* Kavouras Decl., ¶21 (highlighting Brown's LinkedIn profile where he says he had "total P&L responsibility which includes, marketing, distribution, sales, product development" and job description describing him as the "point of contact and leadership for market performance and local execution of STARs, compliance and revenue yield in collaboration with corporate teams").

- "I did not consult on or provide any input to the leaders of other regions regarding their own localized marketing plans or strategies....My plans and strategies....were driven not by any information provided by CVS/Aetna..." (Brown Decl., ¶ 23, ECF 12-1.)

  o *Compare with* Kavouras Decl., ¶¶21-24 (providing meeting dates and materials distributed in advance of such meetings with forecasts).

- I had "little to no involvement" in Duals and "did not have any knowledge or participation in Duals programs in other regions". (Brown Decl., ¶ 25, ECF 12-1.)

- o *Compare with* Kavouras Decl., ¶¶22, 23 (highlighting Brown's attendance at Duals Steering Committee meeting on September 16, 2020, Duals Executive Steering Committee Meetings on November 11, 2020 and December 9, 2020; and DSNP Leadership Forum on December 16, 2020).

- "I did not have access to information about CVS/Aetna's STARS Ratings...I simply did not know, and did not really have a reason to be concerned about, how or what other regions were doing" (Brown Decl., ¶ 27, ECF 12-1.)

  - o *Compare with* Kavouras Decl., ¶26 (attached presentation materials from the Aetna Stars Excellence monthly meetings for October – December 2020 that provided forecasted STARS ratings for various markets and contracts, for 2022 of which Brown received).

- "I do not have knowledge of CVS/Aetna's STARS status in markets outside my former Pacific Northwest and Mountain region..." (Brown Decl., ¶ 28, ECF 12-1.)

  - o *Compare with* Kavouras Decl., ¶25 (noting that such a statement "ignores the fact that Brown received highly confidential 2022 STARS ratings forecasts").

In summary, Brown's Declaration does not provide any justification for denying CVS/Aetna's request for a TRO; rather, the misstatements and omissions in such a declaration make it all the more imperative that this Court issue such an order to prevent the obvious harm that could follow if Brown were allowed to start his position unfettered. Indeed, his argument that he possessed no information that he would use in his position to grow MA nationally is simply not to be trusted, no matter what assurances he might otherwise give.

## II.     This Court has Personal Jurisdiction over Brown.[4]

In assessing whether a plaintiff has made a *prima facie* showing of personal jurisdiction, this Court "must accept the plaintiff's (properly documented) evidentiary proffers as true … irrespective of whether the defendant disputes them, and in so doing, construe them in the light most congenial to the plaintiff's jurisdictional claim." *Astro-Med, Inc.*, 591 F.3d at 8 (citation omitted). Thus, "facts put forward by the defendant become part of the mix only to the extent that they are uncontradicted." *Adelson v. Hananel*, 510 F.3d 43, 48 (1st Cir. 2007). Here, Brown's voluntary attendance at a four-day leadership summit in Rhode Island with CVS/Aetna as well the Agreement with a Rhode Island entity that chooses Rhode Island as the applicable state law, provide more than enough support for personal jurisdiction here.

Personal jurisdiction needs to "satisfy 'both the forum's long-arm statute and the due process clause of the Constitution.'" *Dennett v. Archuleta*, 915 F. Supp. 2d 248, 251 (D.R.I. 2013). Since "Rhode Island's long-arm statute claims jurisdiction to the maximum extent permitted by the Fourteenth Amendment … 'the question becomes whether asserting personal jurisdiction over Defendants is consistent with the Due Process Clause.'" *Id.* (citation omitted). Due process requires that a defendant "have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316 (1945) (citation omitted). "There are two means of establishing jurisdiction over a defendant's person available under the Fourteenth

---

[4] CVS/Aetna reserves the right to file a brief in opposition to Defendant's Motion to Dismiss and/or Transfer Venue within the appropriate time periods. CVS/Aetna understood its reply brief was to be limited to the issues raised by Brown in his opposition to Plaintiff's Emergency Motion for Temporary Restraining Order. Thus, to the extent that this Court deems it necessary to address the jurisdictional issues before addressing such a motion, CVS/Aetna addresses it briefly herein.

Amendment: specific and general jurisdiction." *Astro-Med*, 591 F.3d at 9. A court may exercise either general or specific jurisdiction over a defendant. *United Electrical, Etc. v. 163 Pleasant Street Corp.*, 960 F.2d 1080, 1088 (1st Cir. 1992). Where, as here, the causes of action arise directly out of, and relate to, the defendant's forum-based contacts, the exercise of specific jurisdiction is proper. *Id*.; *Rose v. Firstar Bank*, 819 A.2d 1247, 1251 (R.I. 2003) ("To sustain ... specific jurisdiction, all that need be shown is a 'relationship among the defendant, the forum, and the litigation.'") (internal alteration omitted)).

The First Circuit follows a three-part test to determine whether the exercise of specific personal jurisdiction is appropriate:

> First, the claim underlying the litigation must directly arise out of, or relate to, the defendant's forum-state contacts. Second, the defendant's in-state activities must represent a purposeful availment of the privilege of conducting activities in the forum state, thereby invoking the benefits and protections of that state's laws and making the defendant's involuntary presence before the state's court foreseeable. Third, the exercise of jurisdiction must, in light of the Gestalt factors, be reasonable.

*Id*. at 1089 (the First Circuit refers to the five criteria relevant to "fair play and substantial justice" identified by the Supreme Court in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) as the "Gestalt" factors).  Notably, the "focus on the 'minimum contacts' analysis is not which contacts with the forum are absent, nor where the contacts predominate, but only 'whether enough minimum contacts [with the forum] exist [such] that the district court's assumption of specific jurisdiction does not offend due process." *Production Group Int'l, Inc. v. Goldman,* 337 F. Supp. 2d 788 (E.D. Va. 2004) (emphasis in original) (citations omitted); *see also Nicholson v. Buehler*, 612 A.2d 693, 697 (R.I. 1992) (rejecting a plaintiff's attempt to "isolate numerous contacts" and argue "that each [contact] taken alone does not satisfy the minimum-contacts requirement," because what matter is "the cumulative effect of all such

contacts in their aggregate"). As such, Brown's declarations that he does not own real estate, or been a resident, or pay property or income taxes are entirely irrelevant here. (Brown Decl. MTD Paras. 6-11.)

A.  CVS's Claims against Brown are Directly Related to Brown's Contacts with Rhode Island.

The first part of the First Circuit's threefold test for specific jurisdiction is often described as the "relatedness" requirement. *See Brian Jackson & Co. v. Eximias Pharm. Corp.*, 248 F. Supp. 2d 31, 35 (D.R.I. 2003). The "relatedness" requirement "focuses on the nexus between the defendant's contacts the plaintiff's cause of action." *Id*. (citations omitted). Here, all the claims arise out of Brown's employment and his Agreement with CVS/Aetna and his contacts all relate to such claims.

Brown argues that "[w]hile employed by Aetna, Mr. Brown never worked in Rhode Island and there is no allegation that any alleged breach of the Agreement originated in Rhode Island." Opp. at p. 15. Brown is wrong on the facts[5] and on the law. It is well-settled that activity need not take place in the forum state to establish jurisdiction. Rather, where a non-resident directs its actions at a resident of the forum, it can "be fairly inferred that they intended the brunt of the injury" to be felt in the forum state. *Hugel v. McNell*, 886 F.2d 1, 5 (1st Cir. 1989) ("the personal jurisdiction is proper when an intentional and harmful action from an out-of-state defendant is directed at the forum state, and the defendant knowns that the plaintiff will be harmed by the action in the forum state"); *see also Hilb Group, LLC v. Rainowitz,* C.A. 18-00555 WES, 2019 WL 3543690, at *2 (D.R.I. Aug. 2, 2019) (exercising

---

[5] Brown directly contradicts himself--in paragraph 5 of his Declaration in support of the Motion to Dismiss (ECF 11-1), Brown admits he visited Rhode Island for a multiday training session in February 2020.

jurisdiction over a former out of state employee because "[t]he alleged breach occurred in

Rhode Island because Defendant allegedly purposefully stole [non-Rhode Island] clients that

belonged to [a Rhode Island] Plaintiff, directly injuring Plaintiff in Rhode Island."); *Thompson*

*Trading Ltd. v. Allied Lyons PLC*, 123 F.R.D. 417, 428 (D.R.I. 1989) (finding that exercise

of jurisdiction is fair where the defendant "allegedly tortiously interfered with a Rhode Island

corporation's business rights arising out of a Rhode Island contract, [making it] clearly

foreseeable that such activity would have a direct effect in Rhode Island.").

      This Court frequently exercises specific jurisdiction over out of state employees. *See*

*Hilb Group, LLC*, 2019 WL 3543690, at *2 (exercising jurisdiction over an out of state

employee because he worked for a Rhode Island company, visited Rhode Island and had

contact with the Rhode Island office); *R.J. Carbone Co. v. Regan*, 582 F. Supp. 2d 220, 223

(D.R.I. 2008)(exercising jurisdiction over out of state who interviewed in Rhode Island and

had contact with the employer's Rhode Island office); *Eximias*, 248 F. Supp. 2d at 35 (finding

personal jurisdiction based on a contract partially negotiated and executed in Rhode Island and

the existence of correspondence in and out of Rhode Island). In regard to out-of-state

employees, this Court has also noted that "[t]he absence of Rhode Island customers does not

diminish the quality of [the defendant's] ongoing in-state employment ties …." *R.J. Carbone*

*Co.*, 582 F. Supp. 2d at 223; *see also Eximias*, 248 F. Supp. 2d at 35.

      Here, it is undisputed that Brown signed a contract with a Rhode Island entity that has

its principal place of business in Rhode Island, visited Rhode Island for a multiday employment

training at his own volition, and had contact with the office in Rhode Island. (Brown Decl., ¶

5, ECF 11-1.) His Agreement even contains a choice-of-law provision choosing Rhode Island

as the applicable law and he agreed that any claims arising out of the Agreement must be brought in Rhode Island courts. *See Hilb Grp., LLC v. Rabinowitz*, No. CV 18-00555-WES, 2019 WL 3778738, at *2 (D.R.I. June 13, 2019), *report and recommendation adopted as modified*, No. CV 18-00555 WES, 2019 WL 3543690 (D.R.I. Aug. 2, 2019) (exercising jurisdiction in part because "all of Defendant's personnel records, including the executed Confidentiality and Non-Solicitation Agreement, are maintained in Rhode Island by [the company] as part of the Company's business records"). The fact that Brown was based in Washington does not diminish the quality of his "employment ties" with Rhode Island. *See R.J. Carbone Co.*, 582 F. Supp. 2d at 223; *Hilb Group, LLC*, 2019 WL 3543690, at *2. Indeed, these forum contacts, coupled with the choice of law provision in the Agreement, are more than enough to justify the exercise of personal jurisdiction. *See Burger King Corp.*, 471 U.S. at 482 (recognizing that there is no reason to ignore the defendant's consent to choice-of-law provisions when deciding proper jurisdiction); *Astro–Med, Inc.*, 591 F.3d at 10 (finding a contract's choice of law provision was some of the Rhode Island connections the court found sufficient to satisfy the relatedness prong); *Goetz v. LUVRAJ, LLC*, 986 A.2d 1012, 1021 (R.I. 2010) (acknowledging that a choice-of-law provision is persuasive when deciding personal jurisdiction over an out of state resident).

      B.    <u>Brown Purposefully Availed Himself to Rhode Island by Working for a Subsidiary of CVS and Executing the Agreement</u>.

The second part of the First Circuit's test for specific jurisdiction focuses on the deliberateness of Brown's contacts with Rhode Island. "The requirement of 'purposeful availment' necessitates a voluntary decision by the defendant to inject himself into the local economy as a market participant." *Eximias*, 248 F. Supp. 2d at 35–36. In addition, "[a]lthough

17

physical presence within a forum may alone support the assertion of jurisdiction, it is well settled that physical presence within the forum is not necessary to support jurisdiction." *Nicholson*, 612 A.2d at 697 (finding personal jurisdiction over a plaintiff whose contacts with Rhode Island were limited to phone calls and mailed correspondence).

Courts regularly exercise personal jurisdiction over out of state employees who avail themselves of the privilege of being employed in the forum state. *See Equifax Services, Inc. v. Hitz*, 905 F.2d 1355 (10th Cir. 1990) (affirming exercise of jurisdiction where non-resident employee worked exclusively in another state—he had only visited forum-state employer two or three times); *United Radio, Inc. v. Wagner*, 448 F. Supp. 2d 839 (E.D. Ky. 2006) (exercising of jurisdiction proper where non-resident employee had email and phone contacts with forum-state employer, and his salary was paid from the forum state); *Production Group Int'l v. Goldman*, 337 F. Supp. 2d 788 (E.D. Va. 2004) (exercising of jurisdiction where and out of state employee communicated with the forum-state employer, despite the employee making only limited trips to the forum state and signing his employment agreement in another state). This Court has acknowledged that "[c]ourts in this and other circuits have recognized (increasingly so in recent years) that Internet-based contacts, such as e-mail communications, particularly when coupled with other more traditional contacts, offer compelling grounds for the assertion of personal jurisdiction over a non-resident defendant." *Eximias*, 248 F. Supp. 2d at 37 (collecting cases). This is even more applicable in the employment context, where "forum contacts are a natural result of a contractual relationship, [thereby] indicat[ing] purposeful affiliation with the forum through an interstate contractual relationship." *See Equifax Services, Inc.*, 905 F.2d at 1359.

18

Here, Brown's contacts with Rhode Island easily satisfy the "purposeful availment" prong. He voluntarily attended a four-day leadership meeting and training in Rhode Island one year ago.  Moreover, he was employed by a company that is a wholly-owned subsidiary of CVS, a Rhode Island entity with its principal place of business in Rhode Island.  (Brown Decl., ¶ 5, ECF 11-1.) Those contacts alone are enough to warrant personal jurisdiction.  *See Eximias*, 248 F. Supp. 2d at 37. In addition, he entered the Agreement where he received restricted stock units worth nearly $100,000 from CVS Health Corporation (CVS Pharmacy, Inc.'s parent company), which has its principal place of business in Rhode Island, in exchange for his promises with this Rhode Island entity while agreeing that the contract must be governed by Rhode Island law.[6] *Microfibres, Inc.*, 20 F. Supp. at 321 ("This Court has noted that a defendant's consent to a choice of law provision is at least some indication that [he] purposefully availed h[im]self of benefits from the forum state.").  In sum, Brown "inject[ed] himself into the local economy as a market participant," and his contacts were purposeful, deliberate, and voluntary. *Eximias*, 248 F. Supp. 2d at 35–36.[7]

C.    <u>The Gestalt Factors Favor CVS.</u>[8]

---

[6] Again, Brown also agreed to bring any claims against CVS/Aetna in Rhode Island (Verified Compl., Exhibit A, ¶ 19.), which is more evidence of his "purposeful availment" of the privilege of conducting activities in Rhode Island.

[7] On p.6 of his Memorandum in support of his Motion to Dismiss, Defendant argues that the Washington Non-Compete statute deprives this Court of jurisdiction. But that argument is nonsensical.  At the time the parties signed the contract, there was no Washington statute.  Thus the statute cannot and does not deprive the court of jurisdiction after it was passed. *See Bodine v. Dep't of Labor & Indus.*, 190 P.2d 89, 94 (Wash. 1948) ("It is the general rule that statutes have no retroactive effect unless the legislative intent is so expressed therein."). That is all the more true because the Washington statute does not apply retroactively to <u>contracts</u> executed before its passage. Wash. Rev. Code 49.62.100. Therefore, the Washington statute has no role to play in analyzing personal jurisdiction.

[8] For the purposes of this Reply, CVS/Aetna offers a brief analysis.  CVS/Aetna will brief this issue in more detail in opposition to Brown's Motion to Dismiss.

Because the first two prongs of the *prima facie* test have been met, it becomes Brown's burden to:

> present a compelling case that the presence of some other considerations would render jurisdiction unreasonable pursuant to the five Gestalt factors, which are: (1) the defendant's burden of appearing; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenience and effective relief; (4) the court's interest in obtaining the most effective resolution of the controversy; and (5) the common interests of the sovereigns in promoting substantive social policies.

*Hitz*, 905 F.2d at 1359.  He cannot meet this burden because all factors weigh in favor of CVS. First, Brown has not demonstrated any special or unusual burden in litigation this matter in Rhode Island; indeed, as Brown was forced to concede, due to the COVID-19 pandemic, most if not all of the relevant hearings will likely be held via video conference, so he may not even be required to travel to Rhode Island.  *See Sawtelle v. Farrell*, 70 F.3d. 1381, 1395 (1st Cir. 1995).[9]  Second, Rhode Island has a significant interest in adjudicating this dispute because it involves significant and irreparable harm to a Rhode Island company and Rhode Island employees, and Rhode Island has a vested interest in protecting its residents from illegal conduct of this nature. *See Paradis v. Dooley*, 774 F. Supp. 79, 82 (D.R.I. 1991); *Rose*, 819 A.2d at 1253.  Third, CVS/Aetna has a strong interest in obtaining convenient and effective relief and is entitled to litigate this case in the forum of its choice--its home forum. *Sawtelle*, 70 F.3d at 1395. Fourth, this Court is in the best position to interpret a Rhode Island contract and apply Rhode Island law. *See Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 509 (1947), rev'd on other grounds. Fifth and finally, this lawsuit implicates Rhode Island's ability to provide a convenient forum for its residents to redress significant injuries caused by non-residents.

---

[9] In addition, as noted in footnote 1, Mr. Brown appears to be in the processing of selling his residence in Washington.

*Sawtelle*, 70 F.3d at 1395. Brown is under misguided notion that Washington law will prohibit redress for CVS.  As discussed below, the Washington Noncompetition Law is not applicable to this case, which defeats his position otherwise.  In sum, all of the Gestalt factors favor CVS, and Brown has not—and cannot—met his burden of establishing that jurisdiction is unreasonable. Accordingly, this Court can--and should--exercise personal jurisdiction over Brown.

**IV.     The Agreement is Valid and Must Be Enforced**

       A.     <u>The Agreement is Supported by Adequate Consideration</u>

In his Opposition Brief, Defendant advances the novel claim that the choice of law provisions in the agreement must be ignored because the contract is not supported by adequate consideration.  However, this argument is easily refuted. The Agreement signed by the Defendant, in its very first numbered paragraph entitled "Consideration for Agreement," states that "the Corporation has awarded me equity contingent on the execution of this Agreement and in compliance with its terms. In consideration of the foregoing and the mutual promises in this Agreement, I hereby agree with CVS to comply with the terms of this Agreement." (Verified Compl., Exhibit A, ¶ 1.)  In addition, the Agreement provides that in consideration of Brown's agreement to comply with the provisions of the RCA, the Corporation would provide him with Confidential Information. As has been amply demonstrated, the Corporation, in reliance on Brown's commitments in the RCA, has provided him with a tremendous amount of Confidential Information. Moreover, Paragraph 12 of the Agreement states that the Agreement sets forth the "entire agreement between the parties hereto and fully supersedes any and all prior and/or supplemental understandings, whether written or oral, between the parties

21

concerning the subject matter of this Agreement." Brown's attempt to introduce evidence outside the four corners of the Agreement itself must be rejected. *See Young v. Warwick Rollermagic Skating Ctr., Inc.*, 973 A.2d 553, 559 (R.I. 2009) (quoting *Clark-Fitzpatrick/Franki Found. Co. v. Gill*, 652 A.2d 440, 443 (R.I. 1994)("In situations in which the language of a contractual agreement is plain and unambiguous, its meaning should be determined without reference to extrinsic facts or aids.")). The Agreement is supported by ample consideration. [10] *See Nestle Food Co. v. Miller*, 836 F. Supp. 69, 77 (D.R.I. 1993) ("Even if there was no consideration other than allowing [employee] to continue as an employee with all of the associated benefits associated therewith, such continuation of employment constitutes adequate consideration."); *see also Lavin*, 951 F.3d 50 (finding adequate consideration of $150,000 for agreeing to the limited restrictions on future employment.).

   B.   <u>The Agreement has a Valid Rhode Island Choice of Law Provision.</u>

---

[10] Even if the Court were to look beyond the Agreement itself, Defendant's evidence falls apart. The cover note to the Agreement states explicitly states that "As a condition of accepting your 2019 equity award, you are required to review and electronically sign a restrictive covenant agreement (RCA)." (Verified Compl., Exhibit A, p. 1.)   Moreover, when comparing his sworn declaration with his Opposition Brief, yet another misrepresentation becomes apparent. In his Opposition Brief at page 17, he argues that in March 2019, Brown "received an e-mail from CVS/Aetna informing him that he had earned a bonus and restricted stock award for his 2018 calendar year performance". He does not provide the supposed email but rather cites to Paragraph 17 of his declaration. (*See* Brown Decl., ¶ 17, ECF 12-1.) But his Declaration says no such thing. Indeed, his Declaration makes no reference to <u>any</u> such March 2019 e-mail, nor does it stand for the proposition that <u>Aetna</u> had informed him that he had already earned his equity based on his 2018 performance without signing an agreement. Rather, his Declaration simply states that he was "advised as to my bonus and restricted stock award" which <u>he</u> interpreted as being based on his performance. (Brown Decl., ¶ 17, ECF 12-1.) That subtle but important difference is critical here because there is no evidence advanced by Brown that he had actually been informed by CVS/Aetna that he was to receive his equity grant <u>absent</u> his execution of the Agreement. Indeed, Plaintiff glosses over this fact by stating the irrelevant fact that he has no "record" of receiving separate consideration for it. But the Agreement speaks for itself here and notably Plaintiff has not repudiated the nearly $100,000 in benefits he received.  Any reference to a phantom March 2019 e-mail to the contrary must be ignored by this court.

Because the Agreement is supported by adequate consideration, the Court should next look to the Agreement itself to determine what law should apply in interpreting the Agreement. The Agreement unequivocally provides that: "[t]he Agreement shall be governed by and construed in accordance with the laws of the state of Rhode Island." (Verified Compl., Exhibit A, ¶ 19.)  "As a general rule, parties are permitted to agree that the law of a particular jurisdiction will govern their transaction." *Sheer Asset Mgmt. Partners v. Lauro Thin Films, Inc.*, 731 A.2d 708, 710 (R.I. 1999).  Accordingly, under Rhode Island law, contractual choice of law provisions are binding unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *Id.* (quoting Restatement (Second) Conflict of Laws § 187(2)(a) (1988)) (internal quotations omitted).

Rhode Island courts have recognized that place of performance, the domicile of one of the parties, or the principal place of business of a party all represent reasonable bases for choosing the law of a particular state. *Id*; *see also Erwin Pearl, Inc., et al. v. Those Certain Interested Underwriters at Lloyd's London subscribing to Certificate Number B1262ss0140417/2764*, C.A. No. 19-045 WES, at *3 (D.R.I. Feb. 18, 2020)("Among those jurisdictions in which there is a reasonable basis for choosing the law of that jurisdiction are: (1) the place of performance of one of the parties; (2) the domicile of one of the parties; or (3) the principle place of business of a party.") Here, the parties had a reasonable basis to select Rhode Island law because CVS/Aetna is incorporated in Rhode Island and Rhode Island is its principal place of business. *See Sheer Asset Mgmt. Partners*, 731 A.2d at 710 (affirming choice of law provision based upon the incorporation of the plaintiff); *Erwin Pearl, Inc., et al.*,

23

C.A. No. 19-045 WES, at *3 (upholding a New York choice of law based on the domicile of the plaintiff); *see also* 28 U.S.C. § 1332(c)(1) ("a corporation shall be deemed to be a citizen of every State … by which it has been incorporated").  Therefore, Rhode Island substantive law applies to this matter.

Brown's Opposition Brief ignores this controlling analysis. Instead, he seeks to apply the choice-of-law principles pertinent to <u>tort</u> claims to the breach of contract claim.[11] However, it is well-settled that where the parties have agreed that their contract should be construed under the laws of a particular jurisdiction, Rhode Island follows § 187 of the Restatement (2d) Conflict of Laws, and enforces the parties' choice-of-law agreement unless "the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice." *DeFontes v. Dell, Inc.*, 984 A.2d 1061, 1067 (R.I. 2009) (quoting Restatement (Second) Conflict of Laws § 187(2)(a) (A.L.I. 1971)); *Terrace Group v. Vermont Castings, Inc.*, 753 A.2d 350, 353 (R.I. 2000); *Sheer Asset Mgt. Partners*, 731 A.2d at 710. Accordingly, because the Agreement contains a Rhode Island choice of law provision and CVS/Aetna's principal place of business is Rhode Island, Rhode Island law applies to this matter. There is no place and no reason for this Court to look to other state laws to interpret the contract because the parties already agreed to apply Rhode Island

---

[11] Indeed, Defendant argues that this court should apply the "interest-weighing test" to all claims.  However, courts sitting in diversity only apply that test to the tort-based claims, not contract ones.  *Alifax Holding Spa v. Alcor Sci. Inc.*, 357 F. Supp. 3d 147, 155 (D.R.I. 2019) ("For tort-based claims, Rhode Island follows an interest-weighing approach to determine what jurisdiction "bears the most significant relationship to the events and the parties.")  And even so, Rhode Island law also applies under the interest-weighing test. Here, the interests weigh in favor of the application of Rhode Island law. Due to the limited scope of this Reply and because the issue of the TRO can be fairly based on the contract-based claim, CVS/Aetna anticipates further briefing at the preliminary injunction stage.

law.[12]  Under Rhode Island law, the Agreement is undisputedly valid for the reasons stated in

Plaintiff's original memorandum of law.

      C.      <u>The Agreement is Not Voided by the Washington Non-Compete Law, even if</u>

<u>Washington Law Were to Apply</u>.

      Brown next argues that Washington law applies to this dispute, hoping the court might

draw inspiration from Washington's new statute disfavoring some non-compete agreements.

He suggests that his residence in Washington provides that state, and therefore this Court, with

an overriding interest in applying Washington law, despite what the parties had contractually

agreed to use.[13]  However, there is no reason for this Court to apply Washington law over

Rhode Island law notwithstanding Washington public policy.  Washington law does not act as a

supranational law that must be applied to all contracts to which a resident of Washington is a

party. Indeed, such a rule would deprive federal courts of diversity jurisdiction and mandate

that all claims must be transferred to Washington.  While the Washington statute is too new to

have been subject to judicial scrutiny, such an argument has already been rejected in very

similar instances in cases brought outside California, which has an even more onerous non-

compete statute.  Courts routinely reject the argument that an employee's home state such as

California or Louisiana has a greater interest merely based on its public policy limiting

noncompetition agreements. *See Down-Lite International, Inc. v. Altbaier, et al.*, 821 Fed.

Appx. 553, 556 (6th Cir. 2020) (upholding an Ohio choice of law provision although

"California has a meaning interest in protecting its resident… that interest is not materially

---

[12] At the time the Agreement was signed, Washington had no statute regarding non-competition agreements.
[13] As previously noted, Brown has notified CVS/Aetna of a new address as of January 2021 and his residence in Washington state is up for sale.  Thus, there is a substantial question as to whether this analysis is moot entirely because Brown may no longer be a Washington resident.

greater than Ohio's interest in protecting one of its closely held businesses operating in the global economy"); *Stone Surgical, LLC v. Stryker Corp.*, 858 F.3d 383, 390-91 (6th Cir. 2017) (upholding a Michigan choice of law provision despite a Louisiana employee attempting to avoid the choice-of-law provision because Louisiana law disfavors covenants not to compete). Those courts find that although an employee's home state may have an interest in the matter, that interest must be materially greater than the choice of law provision. *See Down-Lite International, Inc.*, 821 Fed. Appx. at 556; *Stone Surgical, LLC*, 858 F.3d at 390-91. A hostility toward covenants not to compete is not great enough to slide the scale. *See Down-Lite International, Inc.*, 821 Fed. Appx. at 556. Again, no court has yet looked at the Washington statute, but there is no reason to treat its statute differently. Accordingly, Washington's disfavor for restrictive covenants does not make its interest in this case materially greater than Rhode Island's. Here, the parties chose Rhode Island law to apply and CVS/Aetna is a Rhode Island corporation. As discussed above, Rhode Island's interest in protecting its citizens is great. Therefore, the Court should apply Rhode Island law, not Washington law.

Even if the Court were to credit Defendant's argument that it should look to Washington law, despite the plain language of the Agreement providing otherwise, Brown's arguments rely on the mistaken notion that the Washington Non-Compete Law voids the entire agreement. Opp. at pp. 13-14, 31-32. His argument, however, is fatally flawed by the plain language of the law. Wash. Rev. Code 49.62.010 specifically excludes from the definition of "noncompetition covenant" "a covenant entered into by a person ... otherwise acquiring or disposing of an ownership interest." Wash. Rev. Code 49.62.010(4). In exchange for signing

the Agreement, Brown acquired an equity grant in CVS. (Verified Compl., Exhibit A, p. 1, ¶¶ 8, 29, 157, 166.)  In fact, he was granted a total of $97,975.00 of restricted stock units from CVS, and thereby acquired an ownership interest in the company.  (Verified Compl. ¶ 29.) Therefore, the Agreement is outside the statutory definition of "noncompetition covenant" and not covered by Washington Noncompetition Law.

In addition, the statute also does not apply to the whole agreement, only to certain provisions.  By its terms, it does not apply to: "(b) a confidentiality agreement; [or] (c) a covenant prohibiting use or disclosure of trade secrets or inventions."  Wash. Rev. Code 49.62.010(4).  Those provisions are at issue here for the TRO and remain untouched by even the most generous reading of the Washington statute.  Indeed, a compelling case has been made by CVS/Aetna that Defendant will inevitably breach his confidentiality obligations and use or disclose CVS/Aetna's trade secrets if he is allowed to accept the position Cigna has offered.  Therefore, even if the Court were to ignore the choice of law provisions in the Agreement, the Washington statute does not prohibit CVS/Aetna from seeking a TRO in this Court regarding his confidentiality obligations or use covenant not to use or disclose trade secrets.

Brown also argues that the statute invalidates the entire Agreement because it required him to adjudicate a noncompetition covenant outside the state.  Opp. at p. 13 (citing Wash. Rev. Code 49.62.050.)  That argument fails for two reasons. As previously noted, the statute is not retroactive and does not rewrite non-compete agreements; it only applies to <u>claims</u> brought after its passage. Here, however, CVS/Aetna is not seeking to enforce the provision requiring Brown to file claims that he may have in Rhode Island in this lawsuit.  Therefore, the

27

provision is of no consequence here and cannot void the non-competition clause.   However, even that clause were found to violate Washington law, the Washington statute only invalidates that <u>provision</u> requiring him to bring the claim in Rhode Island, not the entire Agreement. Indeed, the parties contemplated that such a provision could be limited or rewritten if it were ever deemed to be unenforceable.   In paragraph 15 of the Agreement, the parties agreed that should any provision be unenforceable, the parties consented to have the provision modified so that it could be enforced "to the maximum extent compatible with the applicable law". Therefore, even if the Agreement could be read to require Brown to bring claims that he has against CVS/Aetna in a court in Rhode Island and even if this provision could be said to violate the Washington Non-Compete law, the provision must be rewritten to make it inapplicable to this matter and therefore this Court can and should otherwise enforce the non-competition provision.[14]   Finally, even if the non-competition provisions were otherwise unenforceable and therefore stricken from the Agreement, the Court can and should continue to enforce the provisions of the Agreement prohibiting disclosure or use of Confidential Information, including trade secrets.  In short, the Washington Non-Compete Law has no relevance to this TRO, much less to this lawsuit.

## VII.   Conclusion

Brown is an experienced corporate leader who regularly negotiates complex contracts. He understands -- or should be deemed to understand -- the obligations of a contract and the

---

[14] Notably, the Agreement is actually valid even if the law were to apply because CVS/Aetna provided consideration for the non-compete covenant and Brown's salary was in excess of $100,000. Wash. Rev. Code 49.62.020 (1)(a)(ii) and (b).

value of Aetna's Confidential Information. He must be held to his promises. A TRO should be issued to preserve the status quo until a preliminary injunction hearing in a few weeks. Because CVS/Aetna is amenable to an Order that Brown can begin work for Cigna immediately, the harm that will flow to CVS/Aetna without a TRO is substantial while the harm to Brown that will flow from an Order limiting the scope of the work he can perform until a hearing in a few weeks is minimal.   For the reasons set forth and based on the cited authorities and the facts before the Court, CVS/Aetna's Emergency Motion should be granted.

PLAINTIFF,
CVS PHARMACY, INC.

By /s/ *Neal J. McNamara*

Neal J. McNamara, R.I. Bar #4249
NIXON PEABODY LLP
One Citizens Plaza
Providence, RI  02903-1345
Tel.:   401-454-1000
Fax:   401-454-1030
Cell:   401-580-3147


Glenn M. Cunningham
(pro hac vice)
Daniel A. Schwartz
(pro hac vice)
Sarah A. Westby
(pro hac vice)
Sheridan King, R.I. Bar #10007
For Shipman & Goodwin LLP
One Constitution Plaza
Hartford, CT 06103-1919
Tel: (860) 251-5000
Fax: (860) 251-5219
gcunningham@goodwin.com
Its Attorneys

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on the 23rd day of February, 2021, the foregoing document has been filed electronically through the Rhode Island ECF system, is available for viewing and downloading, and will be sent electronically to the counsel who are registered participants identified on the Notice of Electronic Filing.

*/s/ Neal J. McNamara*
Neal J. McNamara, R.I. Bar #4249
