UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| CVS PHARMACY INC, | CASE NO. C21-306 MJP |
| Plaintiff, | ORDER DENYING MOTION FOR TEMPORARY RESTRAINING ORDER |
| v. | |
| TIMOTHY M BROWN, | |
| Defendant. | |

This matter comes before the Court on Plaintiff's Motion for a Temporary Restraining Order. (Dkt. No. 3.) Having reviewed the Motion, Defendant's Opposition (Dkt. No. 12), the Reply (Dkt. No. 13), the declarations and supplemental materials filed by the Parties, and having held oral argument on March 12, 2021, the Court DENIES the Motion.

## BACKGROUND

Plaintiff CVS Pharmacy Inc. filed suit against its former employee, Defendant Timothy Brown, alleging that his decision to work for its competitor, Cigna, violates a noncompete agreement and will enable Brown to use CVS's confidential information to its great

disadvantage. CVS pursues three causes of action, for: (1) breach of contract; (2) violations of the Defend Trade Secrets Act, 18 U.S.C. § 1836(b)(3)(A); and (3) violations of the Rhode Island Uniform Trade Secrets Act., R.I. Gen. Laws. § 6-41-1, et seq.

CVS filed this case in Rhode Island, the location of its headquarters and place of incorporation. But the U.S. District Court in Rhode Island agreed with Brown—a Washingtonian—that it lacked personal jurisdiction. The court then transferred the case to this District to cure the want of personal jurisdiction. This left unresolved CVS's Motion for a Temporary Restraining Order, through which CVS seeks to enforce a noncompete covenant for 12 months against Brown preventing him from growing or expanding Cigna's Medicare Advantage business, being involved in dual special needs plans (DUALS) programs, or managing Cigna's Medicare Advantage programs in his old CVS territories. (Compl. ¶ 106 and page 33; Pl. Reply at 1 (Dkt. No. 13).) The Court below reviews the relevant record.

In 2017, Defendant Timothy Brown began working at Aetna, which was later acquired by Plaintiff CVS in November 2018. (Complaint ¶¶ 3-4 (Dkt. No. 1).) Brown has a depth of experience in the insurance industry that dates back to 1995. (Declaration of Timothy Brown ¶ 6.) At Aetna, Brown served first as a Medicare General Manager and later as the Chief Medicare Officer for the Northwest and Mountain regions of the United States. (Compl. ¶¶ 4, 27.) Brown was one of 15 "Chief Medicare Officers" at CVS. (Id. ¶ 23.) After giving advance notice, Brown resigned his position at CVS/Aetna on January 22, 2021. (Brown Decl. ¶ 32.) Brown has taken a position as Medicare Advantage Performance Officer at HealthSpring Management of America, LLC, an indirect subsidiary of Cigna, where he will focus on growing and expanding Cigna's Medicare Advantage programs nationally and overseeing DUALS program proposals outside of his prior Aetna territories. (Id. ¶¶ 32, 35-36, 41.)

CVS alleges that Brown's decision to work for Cigna violates a Restrictive Covenant Agreement he signed in April 2019. (Dkt. No. 1-1 (RCA).) The RCA states that Brown was given equity in CVS and access to confidential information in exchange for agreeing to a noncompete covenant. (RCA ¶ 1.) For twelve months after termination, the noncompete covenant prohibits Brown from "directly or indirectly, engag[ing] in Competition or provide Consulting or Audit Services within the Restricted Area." (RCA ¶ 2; id. ¶ 3.) The term "Competition" means: "providing services to a Competitor of the Corporation . . . that (i) are the same or similar in function or purpose to the services [Brown] provided to the Corporation at any time during the last year of [his] employment by the Corporation; or (ii) will likely result in the disclosure of Confidential Information to a Competitor or the use of Confidential Information on behalf of a Competitor." (Id. ¶ 2(a).) The RCA defines Competitor broadly enough to include Cigna, a point Brown does not appear to dispute. The term "Restricted Area" means the entire United States and anywhere in the world where CVS conducts its business. (Id. ¶ 2(e).)

CVS alleges that Brown will unfairly use and reveal confidential information he has about Aetna's Medicare Advantage business. CVS alleges and argues that Brown was privy to confidential information about Aetna's "Medicare Advantage bids, plans for market expansion, contract renewal and non-renewal, healthcare plan structure and benefits, fees, and STARS ratings forecasts and strategy." (Pl. Mot. at 9 (Dkt. No. 3 at 16); see Compl. ¶¶ 25-26.) The U.S. Centers for Medicare and Medicaid Services (CMS) provides the STARS ratings annually, to measure the quality ratings for all Medicare Advantage plans offered nationally. (Compl. ¶¶ 17, 45-47.) "STARS ratings are a critical component of any health plan's overall financial performance in the Medicare Advantage business and its opportunities for successful growth and expansion." (Compl. ¶ 48.) CVS alleges that even though Brown was only in charge of the

1  Northwest Mountain Market, he received information about national strategies for bids and

2  expansion in 2022, as well as STARS ratings and forecasts. (Compl. ¶¶ 25-26.) CVS alleges that

3  "because Aetna's planning for its Medicare Advantage market expansion and product offerings

4  for the 2022 plan year began between October and December of 2020" "Brown learned Aetna's

5  strategies for formulating and selling its 2022 Medicare Advantage plans." (Compl. ¶¶ 52-53.)

6  CVS alleges that Brown knows where Aetna is "facing financial pressures or has low STARS

7  ratings," and can use this to Cigna's advantage. (Id. ¶ 55.) To buttress these allegations, CVS has

8  submitted a declaration appending slide decks Brown received showing CVS's planning for the

9  2022 Medicare Advantage bidding on a national level. (See Declaration of Michael Kavouras

10 (Dkt. No. 14).)

11      CVS's Motion requires some review of the Medicare Advantage bidding process for

12 insurers. In February each year, an insurer provides CMS with an application "contain[ing]

13 preliminary plans for market expansion and plan renewals." (Compl. ¶ 40.) Then "[f]rom

14 February to June, insurers enter the product development phase of the bid cycle." (Id. ¶ 41.) But

15 it is not until June that the insurer must provide its final bid to CMS containing "proposed plan

16 offerings and projected revenue, utilization and projected costs, for each of for the particular

17 markets covered." (Id. ¶ 42.) Notwithstanding this business cycle, CVS maintains that Brown

18 knows too much about Aetna's business plans for 2022 because he was privy to the planning

19 cycle between October and December 2020: "Brown knows the specific regions where Aetna

20 plans to expand, type of the plans Aetna intends to offer in each region, the regions where Aetna

21 plans were strong (and, therefore, where Aetna would likely invest more heavily in marketing

22 and sales), and the regions where Aetna plans were less strong (and, therefore, where Aetna

23 might invest less in marketing)." (Id.)

24

CVS also alleges that Brown has confidential information regarding Aetna's DUALS business plans, strengths, and weaknesses on a national basis. (Compl. ¶¶ 70-77.) CVS alleges Brown "led" the development and planning for a DUALS program in Nevada that it launched in January 2021. (Id. ¶ 73.) CVS alleges that Brown received confidential information about CVS/Aetna's plans for the DUALS market plans for 2022 through "formal briefing packages related to [DUALS] contracts for the 2022 plan year." (Id. ¶ 75.) As alleged, "Brown now has the blueprint for developing and implementing a successful [DUALS] strategy" to compete with CVS/Aetna. (Id. ¶ 77.)

Brown pushes back against these allegations. First, he states that he did not "retain any confidential documents or information [he] obtained from or through [his] employment with CVS/Aetna." (Brown Decl. ¶ 33.) He states further that he "do[es] not want or need any information [he] obtained from CVS/Aetna in [his] new position at Cigna, which is distinctly different and not similar in any way in function or purpose to the position [he] held at CVS/Aetna." (Id.) He explains that "there are substantial business model differences" between Aetna and Cigna, including that CVS/Aetna uses a fee-for-service model, while Cigna uses a values-based contracting approach. (Id. ¶¶ 37-38.) Second, Brown avers that he did not "attend or participate in any bid information for 2022 at CVS/Aetna and [he has] no information regarding CVS/Aetna's Stars or Duals plans for 2022." (Id. ¶ 31.) And as to DUALS, he states he "had no knowledge of or exposure to what CVS/Aetna was doing nationally, nor what other regions were doing with respect to Duals efforts in various markets within those other regions." (Id. ¶ 30.) He also states that he was involved in the launch of only one DUALS plan and "had no input or involvement in the CVS/Aetna national strategy for Duals." (Id.)

1    The Parties also dispute whether CVS gave Brown valid, independent consideration in
2 exchange for the noncompete promise in the RCA. CVS points to the cover page of the RCA,
3 which states that Brown was required to accept the noncompete in order to obtain "restricted
4 stock units" (RSUs) valued at nearly $98,000. (Kavouras Decl. ¶ 10 & Dkt. No. 1-1 at 2.).
5 Brown disputes this claim. He asserts that the RSUs were awarded to him in March 2019 as part
6 of his incentive compensation for 2019 based on his 2018 performance. (Brown Decl. ¶ 17.) This
7 is reflected in his 2019 Total Compensation & Benefits Statement Based on Performance Year
8 2018, which lists the RSUs as "Long Term Incentives" with a value of $98,000. (See Declaration
9 of Shannon McDougald Ex. A (Dkt. No. 30-1).) Brown argues that the month after he received
10 this compensation notification, he was then required to sign the RCA to obtain the RSUs that had
11 already been awarded. (Brown Decl. ¶ 17.)

12   The Parties also dispute whether the RSUs reflect shares of equity in CVS. Brown points
13 out that the Restricted Stock Unit Agreement governing the RSUs states that: "An RSU does not
14 represent an equity interest in the Company and carries no voting rights [and the ] . . . Participant
15 shall have no rights of a shareholder with respect to the RSUs until the Shares have been
16 delivered to Participant." (McDougald Decl. Ex. B at ¶ 8 (Dkt. No. 30-2) (RSU Agreement).)

17                                          **ANALYSIS**

18 **A.    Temporary Restraining Order Standard**

19   The standard applicable to a motion for a temporary restraining order is "substantially
20 identical" to the preliminary injunction standard. See Stuhlbarg Int'l Sales Co. v. John D. Brush
21 & Co., 240 F.3d 832, 839 n.7 (9th Cir. 2001). "A plaintiff seeking a preliminary injunction must
22 show that: (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in
23 the absence of preliminary relief, (3) the balance of equities tips in her favor, and (4) an
24

injunction is in the public interest." Farris v. Seabrook, 677 F.3d 858, 864 (9th Cir. 2012) (citing Winter v. NRDC, 555 U.S. 7, 20 (2008)); Garcia v. Google, Inc., 786 F.3d 733, 740 (9th Cir. 2015). A TRO is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." Winter, 555 U.S. at 22. And it is "never awarded as of right." Id. In each case, the Courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Id.

The Ninth Circuit applies a "sliding scale" approach in considering the factors outlined in Winter. A stronger showing of one element of the preliminary injunction test may offset a weaker showing of another. All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1131–32 (9th Cir. 2011). So "when the balance of hardships tips sharply in the plaintiff's favor, the plaintiff need demonstrate only 'serious questions going to the merits.'" hiQ Labs, Inc. v. LinkedIn Corp., 938 F.3d 985, 992 (9th Cir. 2019) (quoting All. for the Wild Rockies, 632 F.3d at 1135). Below, the Court reviews the four Winter factors and provides its determination as to why a TRO should not issue on the present record.

**B.  Likelihood of Success**

CVS has not demonstrated a likelihood of success on its breach of contract or trade secret claims.

**1.  Breach of Contract**

To determine CVS's likelihood of success on CVS's breach of contract claim, the Court first determines whether Rhode Island or Washington law applies to the noncompete agreement. Based on the record, the Court finds Rhode Island law applies, but that CVS has not shown a clear likelihood of success.

a. **Choice of Law Analysis**

Sitting in diversity, the court applies the choice-of-law rules of the forum state. See Downing v. Abercrombie & Fitch, 265 F.3d 994, 1005 (9th Cir. 2001). Under Washington law, the Court will "generally enforce contract choice of law provisions with certain exceptions." McKee v. AT&T Corp., 164 Wn.2d 372, 384 (2008). The Court will disregard the contract provision and apply Washington law if: (1) without the provision, Washington law would apply; (2) the chosen state's law violates a fundamental public policy of Washington; and (3) "if Washington's interest in the determination of the issue materially outweighs the chosen state's interest." Id. But "there must be an actual conflict between the laws or interests of Washington and the laws or interests of another state before Washington courts will engage in a conflict of laws analysis." Erwin v. Cotter Health Ctrs., 161 Wn.2d 676, 692 (2007) (citation and quotation omitted). And there will only be an actual conflict "[i]f the result for a particular issue is different under the law of the two states. . . ." Id. (citation and quotation omitted).

The Court does not find there to be an actual conflict between Rhode Island and Washington law on the record before it. First, the Court finds that the Washington Noncompete Act renders CVS's noncompete unenforceable because it requires Brown "to adjudicate a noncompetition covenant outside of" Washington. RCW 49.62.050. And the Court finds the RSUs did not give Brown equity in CVS, meaning that the exclusion in the Noncompete Act is inapplicable. (RSU Agreement ¶ 8); RCW 49.62.010(4)(d). Second, applying Rhode Island to the record before it, the Court also finds that the noncompete is unreasonable as enforced against Brown. The Court's reasoning is explained in more detail in the Section immediately below. As such, there is no actual conflict of law because the result would be the same under both laws. But

1  the Court's choice of law analysis is based on the present, limited record before it, and this

2  analysis may change as the record is more fully developed.

3                              **b.**      **CVS Success on Breach of Contract Claim**

4         Applying Rhode Island law, the Court does not believe CVS has shown that it is likely to

5  succeed on its breach of contract claim.

6         Under Rhode Island law, noncompete clauses are disfavored and "will be enforced as

7  written only if the contract is reasonable and does not extend beyond what is apparently

8  necessary for the protection of those in whose favor it runs." Durapin, Inc. v. Am. Prods., Inc.,

9  559 A.2d 1051, 1053 (R.I. 1989). "The reasonableness of a covenant depends on factors such as

10  whether it is narrowly tailored; whether its scope is reasonably limited in activity, geography,

11  and time; whether the hardship to the employee outweighs the employer's need for protection;

12  and whether enforcement of the covenant is likely to harm the public interest." CVS Pharmacy,

13  Inc. v. Lavin, 951 F.3d 50, 56 (1st Cir. 2020) (citation omitted). "If a covenant is unreasonable, a

14  court may nevertheless modify and enforce the covenant, under Rhode Island's partial

15  enforcement doctrine, to the extent reasonably necessary to protect the employer's legitimate

16  interests, so long as there is 'no evidence of bad faith or deliberate overreaching on the part of

17  the promisee.'" Id. (quoting Durapin, 559 A.2d at 1058). The Rhode Island Supreme Court has

18  made clear that the reasonableness of a covenant is fact-specific: "[w]hen considering the

19  validity of a noncompetition agreement, the crucial issue is reasonableness, and that test is

20  dependent upon the particular circumstances surrounding the agreement." Durapin, 559 A.2d at

21  1053 (citing Max Garelick, Inc. v. Leonardo, 105 R.I. 142, 250 A.2d 354, 356-57 (1969)).

22         Based on the current record, the Court is not convinced that CVS will likely succeed in

23  proving that enforcement of the noncompete against Brown is reasonably necessary to protect its

24

interests. Enforcement of this broad noncompete clause would effectively force Brown out of a job in his chosen profession where he possesses decades of prior experience formed largely before he spent 3 years with CVS. The breadth of the noncompete—effectively worldwide—appears disproportionate to the needs CVS identifies as needing protection. The Court finds attenuated and speculative CVS's claim that Brown will use his knowledge about his regional work at CVS to inform a national strategy at Cigna. Brown avers he has not taken any information or materials from CVS, and that his new role renders his knowledge about CVS's business unhelpful and generally irrelevant, particularly since his new role excludes his old CVS territories. Brown also claims that there are substantial differences in the business models between Aetna and Cigna, which casts doubt on whether Brown's new job has the "same or similar in function or purpose." (RCA ¶ 2(a).) While CVS may ultimately succeed on this claim, the Court is not convinced on the record before it that there is a clear likelihood.

The Court notes that the facts in this case—as the Court currently understands them—appear far afield of those in Lavin where a similar noncomplete was found enforceable as to a former high-level CVS executive of nearly 30 years. Lavin, 951 F.3d at 59. The Court in Lavin noted that the defendant "has extensive knowledge of CVS Caremark's strategic initiatives and detailed information about its contracts with retail pharmacies and payers." Id. The Court concluded that "[i]t strains credulity to think that a top-echelon executive like Lavin could develop a strategy for PillPack [his new employer and competitor of CVS] without dipping into this knowledge." Id. Here the Court cannot make that some conclusion. Brown spent only three years from CVS and the information about his knowledge of CVS's Medicare Advantage and DUALS strategies for the upcoming CMS submissions in June are attenuated. And Brown claims

he does not possess this information and would not even use it in his new role. Thus, the outcome in Lavin does not necessarily support enforcement of the noncompete.

The Court also notes that Brown presents a colorable claim that the noncompete agreement is unenforceable for a want of valid consideration. As Brown argues, CVS awarded him the RSUs as part of his 2019 compensation based on his 2018 performance. Nowhere in the award of this compensation in March 2019 did CVS state that he would also have to sign a noncompete the receive the RSUs. It was until the following month that CVS then conditioned Brown's receipt of the RSUs on signing the noncompete agreement. "The party seeking to enforce a noncompetition provision must show that . . . the provision is supported by adequate consideration. . . ." Durapin, 559 A.2d at 1053. Here Brown has raised a compelling argument that CVS could not promise to pay him the RSUs as compensation in March 2019 based on his prior 2018 performance and then use those same shares as consideration for a separate and new noncompete agreement proposed in April 2019. See Upserve, Inc. v. Hoffman, No. 1:19-CV-00593, 2020 WL 2042979, at *9 (D. R.I. Apr. 28, 2020). The Court finds this further undermines CVS's likelihood of success.

**2.      Trade Secrets Claims**

CVS appears unlikely to succeed on its DTSA or Rhode Island Uniform Trade Secrets claims.

"Misappropriation" under the Defend Trade Secrets Act can be established by disclosure or use of a trade secret "without express or implied consent by a person who—(i) used improper means to acquire knowledge of the trade secret; [or] (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was … acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade

1  secret…" 18 U.S.C. § 1839(5)(B). The DTSA provides the actual or threatened misappropriation
2  of trade secrets may be enjoined. 18 U.S.C. § 1836(b)(3)(A).

3  The Rhode Island Uniform Trade Secrets Act ("RIUTSA") provides for injunctive relief
4  for the misappropriation of trade secrets. R.I. Gen. Laws. § 6-41-1, et seq. To show a protectable
5  interest under RIUTSA, CVS "must assert specific allegations that it possessed information that
6  meets the definition of trade secret under [the act] and must proffer evidence that Defendants
7  actually received the trade secret and improperly used it." Alifax Holding Spa v. Alcor Scientific
8  Inc., 404 F. Supp. 3d 552, 561 (D.R.I. 2019). For the purposes of RIUTSA, "trade secret" is
9  defined, in relevant part, as "information … that [d]erives independent economic value, actual or
10 potential, from not being generally known to, and not being readily ascertainable by proper
11 means by, other persons who can obtain economic value from its disclosure or use." R.I. Gen.
12 Laws § 6-41-1(4)(i). Trade secrets must be "the subject of efforts that are reasonable under the
13 circumstances to maintain its secrecy." Id. at § 6-1-41(4)(ii).

14 CVS faces headwinds in proving that Brown possesses confidential information or trade
15 secrets that he has or will misuse in his role at Cigna. Brown expressly states that he did not
16 maintain any documents or information from CVS. And while CVS has submitted many
17 documents Brown received that it claims contain trade secrets, Brown claims he does not have
18 these files and CVS makes no contrary assertion. Additionally, as Brown's counsel pointed out
19 during oral argument, some of the information in these slides is public, including the STARS
20 ratings—an assertion that the Court notes, but does not resolve. The timing of Brown's
21 resignation from CVS also suggests that whatever information he may have had about CVS's
22 2022 planning for the Medicare Advantage and DUALS markets in late 2020 was likely too
23 preliminary to be useful in his role at Cigna, given that final bids to CMS are not due until June.
24

1 | The Court does not find that CVS has shown a likelihood of success on these claims given the
2 | present record before it.

3 | **C.    Irreparable Harm**

4 |     CVS argues that it will suffer irreparable harm without a TRO because it will "lose its
5 | position as a Medicare market leader and its position in the market will be seriously jeopardized
6 | if it is forced to compete with various plans that Cigna will develop using CVS's Proprietary
7 | Information through its employment of Brown in violation of his agreement with CVS." (Pl.
8 | Mot. at 35.)

9 |     "An enforceable noncompete agreement affords fair protection to a legitimate interest of
10 | the former employer . . . [and] a breach of the agreement occasions harm." Ocean Beauty
11 | Seafoods, LLC v. Pac. Seafood Grp. Acquisition Co., 648 F. App'x 709, 711 (9th Cir. 2016)
12 | (unpublished). Because the harm traced from breach of a noncompete agreement is generally
13 | intangible and difficult to quantify, it generally qualifies as irreparable. See Rent–A–Center, Inc.
14 | v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991). But the harm
15 | cannot be speculative. See Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir.
16 | 1988).

17 |     On the record before it, the Court finds that the harm CVS identifies is rather speculative.
18 | The Court agrees with CVS that if Brown has relevant and up-to-date knowledge about CVS's
19 | weaknesses and strengths in the Medicare Advantage and DUALS programs nationally, then his
20 | new job could harm CVS in ways that the noncompete intended to avoid. But the present record
21 | appears to provide little evidence that Brown possesses such information or that he could use
22 | what he knows to CVS's determinant. The fact is that Brown left CVS before it even made its
23 | preliminary bids to CMS in February. And, as counsel for CVS made clear at oral argument, the
24 |

more important decisions happen between February and June when the final bids are then submitted to CMS. Given that Brown would have had only limited insight into the preliminary planning at CVS at the end of 2020, the Court finds it speculative to conclude that Brown stands ready to exploit his knowledge to CVS's determinant at his new, different role at Cigna. And Brown attests under penalty of perjury that he will not engage in any such exploitation. On the current record, the harm identified is too speculative to support a clear finding of irreparable harm.

**D.     Balance of Equities**

The Court finds that the balance of the equities shows no clear favorite. CVS argues that it entered into the noncompete agreement in exchange for substantial consideration to defend its confidential information about its strategies in the Medicare Advantage and DUALS markets. It also argues that it stands to lose revenue in these highly competitive markets from what it believes is unfair competition from Brown's new role. In contradistinction, Brown argues that enforcing the non-compete would effectively put him out of work and bar him from using his decades of non-CVS-related knowledge and experience in the Medicare Advantage market to earn a living in the profession of his choosing. He argues that he faces a substantial burden on his own financial condition if the TRO is entered, while CVS is far more economically resilient to suffer any potential loss of market share given its annual revenues. And Brown also argues that he was not given adequate consideration to support the non-compete itself.

The Court finds that the equities here do not strongly favor either party, though they do tip generally in Brown's favor given the relative impact the TRO would have on his ability to work for next 10+ months.

| | |
|---|---|
| 1 | **E.     Public Interest** |
| 2 | The Court is not convinced that there is a strong public interest in the granting of the |
| 3 | TRO to enforce the noncompete agreement. The Court is aware that there generally exists a |
| 4 | public interest in the enforcement of contracts, which is reflected in both Rhode Island and |
| 5 | Washington law. See Durapin, 559 A.2d at 1053; Labriola v. Pollard Grp., Inc., 152 Wn.2d 828, |
| 6 | 833 (2004). But as Washington's Noncompete Act frames, overbroad and unfair noncompetition |
| 7 | clauses harm the public interest and constrains the rights of employees. Moreover, the interests at |
| 8 | stake in this litigation are primarily private. On balance, the Court finds that these factors do not |
| 9 | weigh strongly in favor of either party. See Ocean Beauty, 648 F. App'x at 711 |
| 10 | **F.     Court's Balancing of the Winter Factors** |
| 11 | Mindful that a temporary restraining order is an "extraordinary remedy that may only be |
| 12 | awarded upon a clear showing that the plaintiff is entitled to such relief," Winter, 555 U.S. at 22, |
| 13 | the Court finds that the record before it weighs against entry of such an order. The Court does |
| 14 | not find CVS has made a clear showing that it will succeed on its claims or that it will suffer |
| 15 | irreparable harm in the absence of a TRO. Additionally, the Court does not find that the balance |
| 16 | of equities or the public interest favor CVS. The Court finds an insufficient basis on which to |
| 17 | grant the TRO and DENIES the Motion. |
| 18 | **CONCLUSION** |
| 19 | Having reviewed the record as presented and heard oral argument, the Court finds CVS |
| 20 | has not sufficiently supported its request for a Temporary Restraining Order. The Court therefore |
| 21 | DENIES the TRO. |
| 22 | Should CVS continue to seek a preliminary injunction, CVS must first meet and confer |
| 23 | with Brown to see if the parties can reach agreement as to a briefing schedule, Plaintiff's Motion |
| 24 | |

for Expedited Discovery (Dkt. No. 27), and an evidentiary hearing date. The Parties must meet and confer within 2 days of entry of this order and then file a joint status report the following business day with the Court reporting on these issues. Upon receipt of the parties' status report, the Court will rule on Plaintiff's pending Motion to Expedite Discovery (Dkt. No, 27) and set a briefing schedule for Plaintiff's motion for preliminary injunction—if needed.

The clerk is ordered to provide copies of this order to all counsel.

Dated March 16, 2021.

Marsha J. Pechman
United States District Judge